[Cite as *Hughes v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-7353.]

| | |
|---|---|
| GARY W. HUGHES | Case No. 2015-00679 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant at the Allen Oakwood Correctional Institution (AOCI), brings this action alleging that on April 10, 2015, due to negligence on the part of defendant, he was injured from wearing handcuffs that were too small for his wrists. It is also alleged that defendant was negligent in delaying or otherwise providing inadequate medical care for plaintiff's injuries. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} At trial, plaintiff testified that he has been in defendant's custody at several different institutions over the past 23 years, and he has been confined in the protective custody unit at AOCI since January 2013. It was established that AOCI is comprised of two different facilities on opposite ends of the property, Allen and Oakwood, and that the Oakwood facility contains the protective custody unit to which plaintiff is assigned.

{¶3} Plaintiff stated that he suffers from chronic liver problems and was having acute health issues at the time, so a doctor at AOCI ordered that he undergo an ultrasound of his liver and gallbladder at defendant's Franklin Medical Center (FMC) in Columbus. As plaintiff related, on the day of the appointment, April 10, 2015, sometime around 5:00 a.m. Corrections Officer Larry Gilbert escorted him from his cell, and after dropping plaintiff's personal property off at the inmate property vault, Gilbert escorted

plaintiff to the admissions area of the Oakwood facility where he was put in a "strip cage" and changed into transport clothing.

{¶4} According to plaintiff, who is 6'1" and 290 pounds, he told Gilbert that when it came time to place him in restraints he would need either oversized or "soft restraints" rather than standard restraints because his wrists are too large for the standard handcuffs. Plaintiff testified that in 1996, a "medical restriction" was issued by medical personnel at the Southern Ohio Correctional Facility to allow him to have oversized or soft restraints, and it was to remain in effect indefinitely. Plaintiff stated that although he moved to many different prisons afterward and never obtained a renewal of the medical restriction, he assumed it was still in effect. Plaintiff testified that over the years, officers routinely applied oversized restraints to him, but elsewhere in his testimony he also described being put in standard restraints "many times" throughout his incarceration and how the standard handcuffs were problematic every time, and that this time was simply worse than those in the past. Plaintiff also stated that in his experience at every one of the prisons he has been in, it is a protocol of defendant's to have a "white shirt" supervisor present when inmates are dressed out to leave for a trip outside the institution, but on this day there was no supervisor.

{¶5} Plaintiff related that when Corrections Officer Randall Harris came to relieve Gilbert and apply the restraints, Gilbert told Harris that oversized restraints were needed but Harris said none had been provided and that plaintiff would need to tell the transport officers who were coming to get him. Plaintiff recalled that Corrections Officers Tim Boroff and Steve Humes were operating the "hub" transport bus that day, and that Harris told them about the issue with the handcuffs, but Boroff and Humes replied that oversized restraints are not used on hub transports and plaintiff either needed to wear standard restraints or he would not be permitted to board the bus. According to plaintiff, due to the urgent nature of his medical issue he could not forego the trip, so he had

Harris apply the restraints and he got on the bus around 6:00 a.m. Plaintiff testified that there was room between the handcuffs and his wrists for Harris to fit a fingertip.

{¶6} Plaintiff stated that he has experienced some swelling every time he has worn standard handcuffs, but it was worse this particular day. Plaintiff testified that a groove formed on one of his wrists within about 45 minutes, and during the two-hour trip to FMC Boroff and Humes apologized and said they would figure out a better solution the next time. Plaintiff stated that when the bus arrived at FMC he was placed in a holding cell in the maximum security area, and when he complained about the handcuffs corrections officers told him he had to keep the restraints on due to his protective custody status. Plaintiff stated that after waiting for about three hours, he was seen for his appointment, at which time the handcuffs were removed for five to ten minutes, but as soon as it was over Boroff reapplied the handcuffs. According to plaintiff, there were grooves in his wrists and some swelling, and he complained to Boroff but was told that nothing could be done at that time. Plaintiff recounted going back to the cell and waiting for about an hour, at which time his hands started going numb and turning purple.

{¶7} Plaintiff testified that when he got back on the bus, he complained repeatedly to Boroff and Humes, but they apologized and said nothing could be done in the middle of the transport operation. When the bus reached AOCI about two hours later, plaintiff stated, he was taken to the medical department in the Allen facility for a routine medical check that all inmates returning to the institution must undergo, and at that time he complained to a Nurse Harris, but she was not concerned and the restraints remained on. As plaintiff recalled, he was then transported by bus to the Oakwood facility, where Corrections Officer Steven Mayle put him in a strip cage and removed his restraints. According to plaintiff, there were wounds on both wrists, and the right wrist was bleeding. Plaintiff stated that upon seeing this, Mayle went to get a camera, saying that he wanted to document plaintiff's condition, and Mayle took photographs and

prepared an Incident Report. (Plaintiff's Exhibits 3, 4, 18.) Plaintiff stated that Mayle notified Unit Manager Shawn Wakefield and then-Lieutenant Ira Collier, and also contacted the medical department, and when Mayle escorted plaintiff back to his housing unit Mayle advised Corrections Officers Daniel Fifer and Michael Laurita of the same.

{¶8} Within a couple of hours after his return to the unit, plaintiff stated, Nurse Shawn Kiser came to examine him. Plaintiff testified that Kiser cleaned the wounds, applied an antibiotic ointment, and applied a bandage to one wrist, and Kiser also filled out a Medical Exam Report and another assessment form for skin complaints. (Plaintiff's Exhibits 1, 5.) Plaintiff stated that Kiser advised him to apply ice to reduce the swelling and told him that he would be scheduled to follow up with a doctor in a few days.

{¶9} Plaintiff stated that the next morning, he told a Lieutenant Kleanse what happened, and she told him that Lieutenant James Groch was supposed to have been in the transport area when plaintiff left and he should have ensured that the restraints were properly applied. Plaintiff testified that on April 13, 2015, he submitted an Informal Complaint Resolution (ICR) form to Groch. (Plaintiff's Exhibit 10.) According to plaintiff, on April 15, 2015, Groch came to see him and took him to the medical department to see a Nurse Taylor, who filled out a Medical Exam Report which noted a faint red mark on the top of the left wrist and an abrasion on the top of the right wrist. (Plaintiff's Exhibit 2.) Plaintiff testified that he subsequently made repeated visits to see a doctor and other medical personnel, and his prescribed treatment included applying ice, taking vitamin B6, and soaking his wrists in a basin that was temporarily issued to him. Plaintiff explained that he suffers from medical issues which inhibit the healing ability of his skin, and that any bruising or damage to the skin is therefore a concern.

{¶10} Corrections Officer Larry Gilbert testified that he has worked in the Oakwood facility since 1986, and he typically works the third shift, from 10:00 p.m. to

6:00 a.m. Gilbert stated that he does not specifically remember the events in question, but in general when an inmate is to be transported outside the institution his typical process is to escort the inmate down to the admissions area and get him dressed out for the trip, and when the transport officers arrive they are responsible for applying restraints to the inmate.

{¶11} Corrections Officer Randall Harris testified that he has worked for defendant since 1994, and he serves as a transport officer. From Harris' description, he keeps track of whether any inmates need to be transported, either from the Oakwood facility to the Allen facility for appointments, or outside of AOCI entirely, and he or a partner will get weapons and prepare a transport vehicle. Harris testified that inmates are dressed out in orange clothing and then restraints are applied, including leg irons, handcuffs, and a belly chain. Harris described the process by which he applies restraints, including ensuring that he can fit a finger between the handcuffs and the wrist, and double-locking the handcuffs so they cannot close any tighter. Harris stated that once that is done, inmates are escorted to the transport vehicle, secured in the vehicle, and driven to their destination. As Harris explained, he and his partner perform the actual transportation of the inmates between the Oakwood and Allen facilities as well as some non-hub transports to other institutions, and on those trips he or his partner apply restraints belonging to AOCI. Harris also explained, though, that inmates traveling on a hub transport to FMC are driven by hub transport officers, not himself, and the restraints that are applied to inmates on hub transports belong to FMC or defendant's central office, and AOCI's restraints cannot be used. Harris stated that those inmates are held in the admissions area until the hub transport officers arrive with a vehicle.

{¶12} Harris testified that he has a vague recollection of applying a set of standard hub transport restraints to plaintiff that morning, and plaintiff did not complain and there was no indication anything was wrong. Harris has no recollection of Gilbert

telling him that plaintiff needed oversized restraints.  According to Harris, plaintiff then got on the bus with the transport officers and he did not see plaintiff again that day. Harris stated that on April 14, 2015, he prepared an Incident Report after getting a message about an investigation being conducted into a complaint from plaintiff. (Defendant's Exhibit C.)

{¶13} Corrections Officer Steve Humes testified that he has worked for defendant for 22 years, and he serves as a transport officer.  Like Harris, Humes explained that he typically transports inmates between facilities on non-hub transports, but when this occurred there was a staffing shortage for the hub transports so he went along on the trip that day and acted as a hub transport officer.  Humes stated that the hub transport route both to and from FMC included at a stop at Marion Correctional Institution, and he and his partner, Boroff, split up the driving duties.  Humes stated that there were other inmates on the bus besides plaintiff that day, and he explained that plaintiff would have been held in full restraints in a maximum security cell while at FMC because defendant treats inmates in protective custody as maximum security inmates.

{¶14} Humes testified that hub transports only utilize standard restraints issued by defendant's central office in Columbus, unless an inmate has a medical restriction for soft restraints.  Humes stated that transportation officers are issued lists of inmates who have such a medical restriction and there was never any notification prior to this incident about plaintiff having such a restriction.  Humes brought to the trial one set each of standard restraints, one set of soft restraints, and one set of flex cuffs, which are an alternate form of soft restraints; a photograph of these items was admitted as Joint Exhibit 1.  Additionally, Humes testified about the three classes of inmate transports. Humes stated that a Class A transport is the standard method, requiring that the inmate be fully restrained in handcuffs, leg irons, and a belly chain.  Humes stated that a Class B transport does not require those restraints, but it is limited to minimum security

"cadre" inmates or inmates working for Ohio Penal Industries. Finally, Humes stated that a Class C transport involves an inmate with a medical restriction for soft restraints.

{¶15} Humes stated that he did not talk to plaintiff during the bus ride either way and he never heard any complaint from plaintiff about his restraints until the trip was over and plaintiff returned to the Oakwood facility. Humes testified that he had been present just prior to that when the nurse at the Allen facility performed the routine check of all the returning inmates, and plaintiff had expressed no problems then. Nevertheless, Humes stated that when the handcuffs were removed at the Oakwood facility plaintiff complained they were too tight. Humes testified that he did not observe any bleeding or bruising, only a slight indentation, which is normal when one has worn handcuffs for several hours. Humes stated that he told plaintiff he would need to talk to the medical department at AOCI if he wanted to get a medical restriction for special restraints, as there was nothing the corrections officers could do, and he denied making any apology to plaintiff about the situation. Humes testified that on April 14, 2015, he filled out an Incident Report after being advised to do so by a deputy warden of operations. (Defendant's Exhibit B.)

{¶16} Corrections Officer Tim Boroff testified that he has been employed with defendant since 1993, and on the day in question he served as a hub transport officer. Boroff described the hub transport system that defendant utilizes for transporting inmates from the various institutions to FMC. Boroff explained that hub transports are performed either with a van or a bus, depending on the number of inmates involved, and on this particular day they used a bus.

{¶17} Boroff stated that he and his partner, Humes, dressed out and loaded onto the bus any inmates from the Allen facility, then drove to the Oakwood facility to pick up plaintiff and any other inmates there. Boroff recounted that when they arrived at the Oakwood facility, plaintiff was already dressed out and wearing a set of standard restraints. According to Boroff, inmates on hub transports must wear restraints

belonging to the hub system, and they must be standard restraints unless inmates have a medical restriction issued by a physician for special restraints. Boroff also indicated that a supervisor, if present, may have authority to deviate from this policy, but as a corrections officer he had no discretion to permit plaintiff to wear anything other than standard restraints. Boroff stated that, as far as he was aware, plaintiff did not have a medical restriction on file.

{¶18} Furthermore, Boroff stated that plaintiff did not complain to him at all about his wrists or handcuffs. From Boroff's recollection, plaintiff also made no complaints upon returning to AOCI and undergoing the routine check by the nurse at the Allen facility. Boroff testified that it was not until plaintiff was returned to the Oakwood facility that he made any complaint at all. Boroff stated that he removed the handcuffs in the strip cage at Oakwood, and at that time plaintiff rubbed his wrists and said the handcuffs were a little too tight. Boroff recalled seeing some redness and indentations on plaintiff's wrists, but no swelling or blood. According to Boroff, when plaintiff was asked why he did not mention anything to the nurse whom he had just seen at the Allen facility, plaintiff stated that it was not a big deal.

{¶19} Boroff testified that on April 15, 2015, he prepared an Incident Report at the request of the institutional inspector, who was looking into plaintiff's complaint about the matter. Boroff explained that, at the time of the events on April 10, 2015, there did not seem to be any issue significant enough to fill out a report. (Plaintiff's Exhibit D.)

{¶20} Corrections Officer Daniel Fifer testified that he has worked for defendant for about 23 years. Fifer stated that his normal assignment when these events occurred was supervising the "West 2" unit at the Oakwood facility during the third shift, such that he was present when plaintiff left the unit on the morning of April 10, 2015, and on that particular day he also came in to work the second shift starting at 2:00 p.m., such that he was present when plaintiff returned. Fifer added that Corrections Officer Michael Laurita was also assigned to the unit with him during the second shift.

{¶21} Fifer testified that he received a slip of paper that morning stating that plaintiff was to leave AOCI on a transport, but he did not know where plaintiff was headed and he had no involvement in the transport. Fifer recalled that when plaintiff was escorted back to the unit after the transport, plaintiff showed him his wrists, which were red and swollen and looked bad, and he told whoever was escorting plaintiff that this should not have happened. Fifer stated that a nurse was called, but he did not have any interaction with the nurse who saw plaintiff that evening.

{¶22} Corrections Officer Michael Laurita testified that he was assigned to the West 2 unit during the second shift at the time of these events and he was present when plaintiff returned from the transport. Laurita authenticated an entry he made in the unit log book at 5:48 p.m. to document plaintiff's return to the unit. (Defendant's Exhibit A.) Laurita stated that he has no recollection of plaintiff complaining of any injury or showing him his wrists.

{¶23} Lieutenant James Groch, Jr. testified that he has been employed with defendant since 2004, and at the time of these events he worked various hours at AOCI, with his primary responsibility being supervision of inmate transportation in and out of the institution. Groch stated that he does not know whether he was on duty at the time plaintiff left the institution, but he knows that he was not present when plaintiff was dressed out and placed in restraints that morning. Groch also stated that a supervisor such as himself is supposed to be present when an inmate goes through that process.

{¶24} Groch testified that when inmates leave AOCI for a hub transport, such as the one that plaintiff went on, defendant's Columbus-based hub system supplies the restraints, not AOCI. Groch stated that oversized restraints, which are slightly larger than standard restraints, are available for use inside AOCI, but the hub transports do not utilize oversized restraints at all. Groch also stated that soft restraints may be utilized on hub transports, but whether it is on a hub transport or elsewhere an inmate

may only have soft restraints when the medical department has issued a medical restriction specifically authorizing soft restraints.

{¶25} Groch stated that he learned about this incident when he received plaintiff's ICR. (Plaintiff's Exhibit 10.) Groch related that he subsequently investigated plaintiff's complaint, including interviewing plaintiff and at least Boroff and Humes, if not other employees. According to Groch, during their interview plaintiff was primarily upset with the medical department for not having a medical restriction for soft restraints on file. Groch testified that he contacted the medical department at AOCI and determined that plaintiff indeed did not have a medical restriction for soft restraints in effect at the time of this incident, and he authenticated a memorandum he received from Nurse Lisa Peterson documenting that fact. (Plaintiff's Exhibit 8.) Groch further testified that at his request the medical department had a nurse examine plaintiff on April 15, 2015, and prepare a corresponding Medical Exam Report. (Plaintiff's Exhibit 2.)

{¶26} Corrections Officer Steven Mayle testified that he has been employed with defendant for over 20 years, and at the time in question he worked the second shift in the Oakwood facility, from 2:00 to 10:00 p.m. Mayle testified that when plaintiff arrived back in the admissions area of the Oakwood facility, plaintiff complained that his wrists hurt. According to Mayle, the handcuffs did not necessarily look to be too tight from his observation, but when he removed them and looked at plaintiff's wrists, he observed slight swelling and a little redness, but no blood.

{¶27} Mayle stated that he contacted his supervisor, then-Lieutenant Ira Collier, and was advised to take photographs, which he did, and he also prepared an Incident Report. (Plaintiff's Exhibits 3, 4, 18.) Mayle related that there was no nurse available at that moment, so when he escorted plaintiff back to the housing unit he advised Fifer that a nurse needed to come by and take a look at plaintiff.

{¶28} Captain Ira Collier testified that at the time of this incident, he was a lieutenant assigned to the Oakwood facility and worked the second shift, from 1:00 p.m.

to 9:00 p.m.  As far as Collier could recall, he was present when plaintiff returned to the Oakwood facility late that afternoon, and the issue with the restraints was brought to his attention, probably by Mayle, but he does not remember having any contact with plaintiff that day.

{¶29} Shawn Wakefield testified that he now works at the Allen facility, but at the time of this incident he was the Unit Manager for the entire Oakwood facility.  Wakefield testified that he did not learn about these events until several days after the fact, when plaintiff brought it to his attention and showed him his wrists.  Wakefield described observing a light red circular mark on one of the wrists.  Wakefield stated that he asked plaintiff how it happened and he made sure that plaintiff had been seen by medical personnel.

{¶30} Robert Yochum, R.N. testified that he is employed with defendant as the acting Health Care Administrator for AOCI.  Yochum testified that he has worked for defendant for many years in various medical and mental health positions, and his experience also includes EMT and paramedic work, and 20 years as a medic and nurse in the Army.  Yochum testified that he has reviewed plaintiff's medical records, and he authenticated portions of the records, including a progress note written by Quinlan Harris, RN, documenting that she examined plaintiff when he arrived back at the Allen facility at 5:00 p.m. on April 10, 2015, noting that he denied any pain or discomfort. (Defendant's Exhibit E.)  Yochum also testified about medical restrictions, explaining that they remain effective for up to one year from the date of issuance, and they must be renewed to be effective any longer than that.  Yochum stated that when he reviewed plaintiff's medical file, he did not find any medical restrictions predating the events of April 10, 2015.

{¶31} "In a claim predicated on negligence, plaintiff bears the burden of proving by a preponderance of the evidence that defendant breached a duty owed to him and

that this breach proximately caused the injury." *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 744 (10th Dist.1998).

**{¶32}** "In the context of a custodial relationship between the state and its prisoners, the state owes a common law duty of reasonable care and protection from unreasonable risks." *Nott v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-842, 2010-Ohio-1588, ¶ 8. "Although the state is not an insurer of the safety of inmates, once it becomes aware of a dangerous condition it must take reasonable care to prevent injury to the inmate." *Harwell v. Grafton Correctional Institution*, 10th Dist. Franklin No. 04AP-1020, 2005-Ohio-1544, ¶ 11. "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16.

**{¶33}** Upon review of the evidence presented at trial, the magistrate finds as follows. On April 10, 2015, plaintiff was escorted to the transportation area at the Oakwood facility, dressed in transport clothing, and placed in a set of standard restraints, including leg irons, handcuffs, and a belly chain. When Corrections Officer Harris applied the handcuffs, he was able to fit a finger between the handcuffs and plaintiff's wrist. The method used by Harris for assessing the tightness of the handcuffs was appropriate. *See Harwell* at ¶ 12.

**{¶34}** Sometime after 6:00 a.m., Corrections Officers Boroff and Humes escorted plaintiff out of the Oakwood facility and secured him in a bus, which held as many as about 20 other inmates, and the bus proceeded on a hub transport route to FMC, making one stop along the way at Marion Correctional Institution. When the bus arrived at FMC, plaintiff was escorted inside and placed in a maximum security holding cell. Pursuant to departmental policy, inmates such as plaintiff who are in protective custody

must remain in full restraints in a maximum security cell while waiting at FMC. The restraints were removed for five to ten minutes when plaintiff underwent an ultrasound and then the restraints were reapplied and he was escorted back to the holding cell. When the handcuffs were reapplied, there were no abrasions or other wounds on plaintiff's wrists.

{¶35} In the afternoon, Corrections Officers Boroff and Humes secured plaintiff and the other inmates in the bus and returned to AOCI. It is defendant's policy that all inmates returning from hub transports are examined by medical personnel upon returning to the institution. In accordance with that policy, plaintiff was escorted inside the Allen facility at 5:00 p.m. and examined by a nurse, while still in restraints. Based upon the progress note written by the nurse and the recollection of the officers escorting him, it is probable that plaintiff did not express a complaint at that time. Afterward, plaintiff was escorted back to the bus and transported across the property to the Oakwood facility.

{¶36} Pursuant to standard procedure, plaintiff's restraints were removed once he entered the Oakwood facility at approximately 5:20 p.m. For the first time, some minor injury to the skin could be seen, directly underneath where the handcuffs had been secured on the wrists, but there was no bleeding. Plaintiff complained to corrections officers at that time. Corrections Officer Mayle photographed plaintiff's wrists and arranged for a nurse to come and examine him. At 8:56 p.m., a nurse examined plaintiff's wrists and applied a bandage over abrasions on the right wrist. On or after April 13, 2015, plaintiff submitted an ICR to Lieutenant Groch to complain about the events that occurred three days earlier, and, as a result, Groch arranged for plaintiff to be evaluated again by a nurse on April 15, 2015, almost immediately after Groch became aware of this matter. Several times thereafter, plaintiff received additional care and treatment for his wrists from AOCI medical personnel.

{¶37} The magistrate finds that plaintiff did not establish a breach of defendant's duty of reasonable care. When the handcuffs were applied to plaintiff on the morning of April 10, 2015, they fit appropriately. Although plaintiff testified that indentations formed in his skin as the day went on, some temporary indentations in the wrist commonly occur when one wears handcuffs for a long period of time, as Corrections Officer Humes stated. Departmental policy required that plaintiff wear handcuffs at all times both on the bus and at FMC, other than when he received the ultrasound, and defendant's actions in conformance with such policy are protected under the doctrine of discretionary immunity. *See Reynolds v. State*, 14 Ohio St.3d 68, 70 (1984). The abrasions or irritation to the wrists upon which this lawsuit is predicated were not present when the handcuffs were removed at FMC during the ultrasound and could not be seen until the handcuffs were removed back at the Oakwood facility. Although plaintiff probably did complain about the handcuffs at some point to Corrections Officers Boroff or Humes, the handcuffs had fit appropriately that morning, there were no wounds visible, the handcuffs did not outwardly appear to be too tight even by the time plaintiff returned to Oakwood, and the foreseeability of injury was lacking. Insofar as plaintiff testified that he has a medical condition inhibiting the ability of his skin to heal, there is no evidence that the corrections officers knew this, and the nature of this concern underscores the fact that it is up to medical professionals to determine whether an inmate should have special restraints.

{¶38} It is plaintiff's contention that when he was prepared for the transport in the morning he should have been placed in soft restraints or oversized restraints, but the evidence clearly establishes that, as a general rule, an inmate must have a valid medical restriction issued by a physician specifying the need for such restraints. There is no such document in plaintiff's medical file predating the day in question. Even if it is true that plaintiff had been issued a medical restriction at the Southern Ohio Correctional Facility in 1996, it was established that medical restrictions are not valid for

more than one year, unless they are renewed. Any medical restriction plaintiff might have been issued in 1996 expired long ago. Indeed, plaintiff testified that in the intervening years he moved around to numerous prisons and there were "many times" where he had problems with standard restraints.

{¶39} There was some evidence adduced that a supervisor may have the discretion under certain circumstances to allow the use of non-standard restraints, and plaintiff emphasized that he felt a supervisor should have been present when he left for the trip, but whether a supervisor had been present or not, the handcuffs were checked and found to fit properly, making special restraints unnecessary at that time. Notwithstanding the purported medical restriction from 1996, the evidence also does not show that plaintiff requested or was evaluated for a medical restriction for oversize or soft restraints prior to April 10, 2015, even less so that any physician employed by defendant was negligent in failing to issue him one.

{¶40} To the extent that plaintiff alleges defendant was negligent in delaying or otherwise providing inadequate medical care for his injuries, there was not shown to be any unreasonable delay in the medical care and treatment plaintiff received after the accident. The magistrate finds that plaintiff did not demonstrate by a preponderance of the evidence that defendant breached a duty of care owed to him with regard to his medical care and treatment at any time, nor any harm proximately caused by such a delay.

{¶41} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶42} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first*

*objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Amy S. Brown
James P. Dinsmore
Timothy M. Miller
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Ashley A. Barbone
Assistant Attorney General
Legal Initiatives Section
30 East Broad Street, 17th Floor
Columbus, Ohio 43215

**Filed September 20, 2016**
**Sent to S.C. Reporter 10/17/16**